FILED
2019 Nov-07  PM 04:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

TRACI JONES; and GREATER BIRMINGHAM MINISTRIES,

*Plaintiffs*,

v.

JEFFERSON COUNTY BOARD OF EDUCATION; and ALAN KING, in his official capacity as the Jefferson County probate judge,

*Defendants*.

COMPLAINT

Civil Case No. _____

## INTRODUCTION

1. Plaintiffs Traci Jones and Greater Birmingham Ministries (together, "Plaintiffs) challenge the at-large multimember district for electing four of the five-members of the Jefferson County Board of Education (the "Board") because it has a racially discriminatory purpose and result in violation of Section 2 of the Voting Rights Act ("Section 2") and the U.S. Constitution.

2. Under the "hybrid plan," four members are elected at-large from a multimember district and a fifth member is elected from a single-member "subdistrict." Whites are a substantial majority (68%) of the multimember district's citizen voting-age population. Black (49.5%) and Hispanic (1.3%) people together are a majority of the subdistrict's citizen voting-age population.

3. The Section 2 and the Fourteenth Amendment violations are established, in part, because (1) the Black population of Jefferson County is sufficiently numerous and geographically compact to form a majority of the voting-age population in at least two (out of five) single-member districts (whereas, today, only the subdistrict is majority-Black); (2) Black voters are politically cohesive in elections; (3) white voters in the multimember district tend to vote as a bloc against

1

the candidates preferred by Black voters, resulting in no Black candidate ever having won an election in the multimember district; (4) the multimember district uses numbered posts, intentionally discriminatory candidate qualifications, and other discriminatory structures that enhance the opportunity for racial discrimination; and (5) the intent of the Alabama Legislature in enacting the at-large multimember district was to dilute Black voters' influence in Board elections.

4.      Plaintiffs seek to enjoin Defendants' use of the at-large multimember district and replace it with four single-member districts that protect the voting rights of the Black community.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this civil action and can grant appropriate relief pursuant to 28 U.S.C. §§ 1331, 1343(a), and 1357; 28 U.S.C. §§ 2201 and 2202; 42 U.S.C. § 1983; and 52 U.S.C. §§ 10301, 10302, 10308(f), and 10310(e).

6.      This Court has personal jurisdiction over Defendants, all of whom are in Alabama.

7.      Venue is proper under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the Northern District of Alabama.

## PARTIES

8.      Plaintiff Traci Jones is a U.S. citizen and duly registered Black voter in Jefferson County. Defendants' hybrid plan, in combination with racially polarized voting and other practices, denies or abridges her right to equally participate in the political process and to elect her preferred representatives to the Board. Ms. Jones lives in an area of Jefferson County that could be included in a properly apportioned single-member majority-Black district that, if created, would remedy the identified Section 2 and constitutional violations. She is a plaintiff in *Stout v. Jefferson County Board of Education*, No. 2:65-cv-00396 (ECF Dkt. No. 2:16-mc-00199).

9.      Plaintiff Greater Birmingham Ministries ("GBM") was founded in 1969 in response

to the urgent human rights needs in the greater Birmingham, Alabama area. GBM is a multi-faith, multi-racial membership organization that provides emergency services for members and other people in need. A central goal of GBM is the pursuit of social justice in the governance of Alabama and opposition to state and local laws that serve to exclude vulnerable groups or persons from the democratic process. Toward that end, GBM regularly engages in efforts to register, educate, and increase turnout among Black voters, Hispanic voters, low-income voters, and all other voters.

10.    GBM's membership includes both newly registered Black voters under age 21 and longtime Black voters who live in the multimember district and the subdistrict. GBM members live in areas of the County that could be included in properly apportioned single-member majority-Black districts that, if created, would remedy the identified Section 2 and constitutional violations.

11.    Defendant Jefferson County Board of Education is the governing authority of the Jefferson County, Alabama public school system. Ala. Code § 16-63-4. The Board elects and seats its members pursuant to the at-large multimember district. Ala. Code § 45-37-100. The Board helps to administer its elections and is required to comply with Section 2 and the U.S. Constitution.

12.    Defendant Alan King is sued in his official capacity as the probate judge solely to ensure a complete remedy. As the chief election official of Jefferson County, he is charged with administering the Board's hybrid plan and complying with Section 2 and the U.S. Constitution.

## FACTUAL ALLEGATIONS

### I.    The Demographics of Jefferson County

13.    According to the 2010 Census, the total population of Jefferson County is 658,466 people. Of this total population, 503,938 (54.5%) are non-Hispanic white people, 280,083 (42.5%) are non-Hispanic, any part Black, and 25,488 (3.87%) are Hispanic people of any race. The voting age population ("VAP") of Jefferson County is 503,938. Of that, 274,788 (54.5%) are white;

3

202,381 (40.2%) are single-race Black; and 17,090 (3.4%) are Hispanic.

14.     Per the 2017-2013 American Community Survey ("ACS"), 13.1% of Black people and just 7.4% of white residents did not finish high school. For 30.6% of Black people and 24.1% of whites their highest level of education is a high school degree or the equivalent. Thus, 43.7% of Black and 31.5% of white residents' highest level of education is a high school degree or less.

15.     Per the ACS, Black family households (23.2%) are nearly four times more likely than white family households (5.9%) to have lived below the poverty line in the last year. Of the total population, 25.9% of Black and 9.4% of white residents' incomes in the last year were below the poverty line. Half of Black (50.2%) and only 26.6% of white households earned under $35,000. The median Black household ($34,738) and family household ($42,369) income in the last year are half the median white household ($65,100) and family household ($85,955) annual incomes.

16.     According to the ACS, unemployment of the working age population (ages 16 to 64) for Black residents (12.3%) is double that of whites (5.0%). Twice as many Black (18.2%) people than whites (9.2%) aged 18 to 64 lack health insurance. Over five times the number of Black households (27.5%) as white households (5.6%) were on food stamps/SNAP in the last year.

17.     The enrollment population of the Board school system is 47% Black students and 43% white students. Black faculty and staff makeup 18% of the Board school system's workforce.

## II.     The Hybrid Plan for Electing the Board

18.     Act No. 645 (1975) is a local act passed by the Alabama Legislature that established the hybrid plan for the Jefferson County Board of Education. The Board elects five members: four are elected from the multimember district and one is elected from the single-member subdistrict.

19.     The residents of the multimember district elect four Board members at-large from the geographic area of Jefferson County where the Board operates the public schools. Candidates

for seats in the multimember district must live in that district. The fifth member is elected from the single-member subdistrict by the voters residing in those areas of the County where independent municipal school systems operate the public schools. The fifth member must live in the subdistrict. Ala. Code 1975 § 45-37-100.

20.     Act No. 645 has been amended twice in 1997 and 2001, however, neither of these amendments modified the composition or jurisdiction of the multimember district or subdistrict.

21.     Act No. 143 (1997) enhanced the racially discriminatory nature of the multimember district by establishing numbered places and staggered six-year terms for each Board member. H.B. 25, 1997 Reg. Sess. (Ala. 1997).

22.     Following Act No. 143, the at-large multimember district elects Board members from Numbered Places 1, 2, 3, and 4. The subdistrict elects the Place 5 member. The next Place 1 and 5 elections are in 2022; Place 2 and 3 elections are in 2024; and Place 4 in 2020.

23.     By 1997, because of the *Dillard v. Crenshaw County* litigation, 640 F. Supp. 1347, 1361 (M.D. Ala. 1986), it was well-known in Alabama that numbered places acted as anti-single shot voting rules, which enhance the discriminatory effect of at-large election systems. Numbered places impose a majority vote requirement in elections for each available seat and thus make it very difficult, if not impossible, for a minority group to elect its preferred candidate. In the absence of numbered places, a minority group could win some at-large seats if it concentrated its vote behind a single candidate while the majority divided its votes among various different candidates.

24.     Act No. 230 (2001) simply provides that if a Board member moves from the district served by that Board member's numbered place, that Board member's seat shall be deemed vacant. H.B. 181, 2001 Reg. Sess. (Ala. 2001).

25.     Act No. 645, as amended, is currently codified at Alabama Code § 45-37-100.

26.     At present, the multimember district's total population is 230,679 and its VAP is 176,350. Amongst that VAP, 70.5% are white, 25% are Black, and 2.8% are Hispanic.

27.     The subdistrict's total population is 427,787 and its VAP is 327,408. The subdistrict's total population is majority Black (50.13%). The VAP of the subdistrict is plurality Black and majority-minority: 48.2% Black VAP, 46% white VAP, and 3.7% Hispanic VAP.

28.     The five Board members are elected in general and primary elections to specific Numbered Places. All members possess the same authority and voting powers.

29.     The primary elections have a majority vote requirement. Ala. Code § 17-13-20.

30.     The growth of the Black population in Birmingham and other cities has resulted in the subdistrict becoming majority-Black, allowing Black voters to elect their preferred candidate. The subdistrict's current racial makeup is similar to its makeup in the 1986 election and onwards.

31.     From 1986 to 2018, Jacqueline Anderson Smith, a Black woman and the Black preferred candidate, was repeatedly elected to the Board from the majority-Black subdistrict. She is the only Black person ever elected to the Board. Ms. Smith recently resigned. Thereafter, the Board appointed Carita Venable, a Black woman, in February 2019 to finish Ms. Smith's term.

32.     The four Board members elected from the at-large multimember district are white.

33.     No Black person has ever been elected to the Board from the multimember district.

**III.     The Multimember District Violates Section 2 of the Voting Rights Act**

34.     Section 2 prohibits vote dilution: the use of electoral schemes, like at-large voting districts, candidate qualifications and numbered places, that minimize or limit Black voting strength. 52 U.S.C. § 10301(b). Discriminatory intent is not required to prove a Section 2 violation.

35.     Defendants' at-large multimember district, in combination with racially polarized voting, numbered place requirements, and other factors, violate Section 2 and the U.S. Constitution

because they have the purpose or result of abridging the rights of Plaintiffs and Black voters in Jefferson County to an equal opportunity to participate in the political process and to elect representatives of their choice. 52 U.S.C. § 10301(b).

### A.       The *Gingles* Preconditions

36.       In *Thornburg v. Gingles*, the Supreme Court of the United States identified three preconditions, each of which Plaintiffs satisfy, necessary for a claim that a voting practice results in an actionable vote dilution claim under Section 2: (1) Black voters must be "sufficiently large and geographically compact to constitute a majority in a single-member district," (2) Black voters must be "politically cohesive," and (3) the white population must vote "sufficiently as a bloc to enable it . . . usually to defeat [Black voters'] preferred candidate." 478 U.S. 30, 50-51 (1986) (citation omitted).

37.       Per the 2010 census, the total Black population of Jefferson County is 280,083 (42.5%). Under a plan with five properly apportioned single-member districts, the Black population in Jefferson County is sufficiently numerous and geographically compact enough to allow for the creation of two (out of five) single-member districts in which Black voters would constitute the majority of those two district's total, voting-age, and citizen voting-age populations.

38.       For example, the Jefferson County Commission, which covers the same geographic area as the Board, has five single-member districts.[1] Under the current County Commission map, Districts 1 and 2 are majority-Black. The Board could adopt the same single-member district map.

39.       Elections in the County are racially polarized. Black voters are politically cohesive and white bloc voting consistently defeats Black preferred candidates in the multimember district.

---

[1] Jefferson County Information Technology, GIS Division, *Jefferson County Commission Districts*, https://www.jccal.org/Sites/Jefferson_County/Documents/Commission/CommissionDistricts2018.pdf.

40.     Since 1986, the Black preferred candidate has won elections in the majority-Black subdistrict. The only Black person ever elected to the Board has been from the subdistrict.

41.     In contrast, no Black person has ever been elected from the multimember district.

42.     For example, in 2018, Martha Bouyer, a Black woman and Black voters' preferred candidate, lost to a white candidate in the racially polarized general election for Place 2 in the multimember district. Because Dr. Bouyer had been being appointed to Place 2 in 2014 to complete the unexpired term of a resigning (white) Board member, Ms. Bouyer ran in 2018 as an incumbent.

43.     Other Jefferson County elections are also racially polarized. For example, the Black preferred candidates lost races countywide for Sherriff in 2014, District Attorney in 2010 and U.S. Senate in 2008. In the 2008 Senate race, 100% of Black voters in Jefferson County backed the Black candidate, but over 80% of white voters who supported her white opponent. *See* Lichtman Expert Report at 13, *Ala. Legis. Black Caucus v. Alabama*, No. 2:12-cv-00691, ECF No. 168-1.

44.     Black voters have sometimes been able to elect the candidates of their choice in recent countywide elections. The multimember district (25% Black, 70% white VAP), however, has many more whites in it than the whole of Jefferson County (40% Black, 54% white VAP). So, while there are sometimes enough Black voters and white crossover voters for Black preferred candidates to win countywide, Black candidates have consistently lost in the multimember district.

45.     For example, in the racially polarized 2018 elections, Sheriff Mark Pettway and District Attorney Danny Carr, the Black preferred candidates, won 51% and 56%, respectively, of the total votes cast in all precincts countywide. In that same election, however, Sheriff Pettway and Mr. Carr got only 44% and 47% of the ballots cast in those precincts with voters located in the multimember district, thereby losing the multimember district's precincts to their white opponents.

8

### B.     The Totality of Circumstances

46.     Section 2 requires a "totality of the circumstances" analysis to prove that Plaintiffs and other Black voters "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

47.     Here, in addition to the *Gingles* preconditions, the totality of the circumstances also demonstrates that the at-large multimember district denies Black voters the equal opportunity to participate in the political process and to elect candidates of their choice. *Id.*

48.     There is a long, well-documented history of racial discrimination against and unresponsiveness to the needs of Black people in Jefferson County and in Alabama generally in voting, employment, juries, and other areas. *See Ala. Legis. Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015), *on remand* 231 F. Supp. 3d 1026 (M.D. Ala. 2017) (three-judge court); *City of Pleasant Grove v. United States*, 479 U.S. 462 (1987); *Hunter v. Underwood*, 471 U.S. 222 (1985); *Cochran v. Herring*, 43 F.3d 1404 (11th Cir. 1995); *Ala. State Conf. of NAACP v. City of Pleasant Grove*, No. 2:18-cv-02056, 2019 WL 5172371 (N.D. Ala. Oct. 11, 2019); *United States v. Jefferson County*, No. 74-S-17, 2013 WL 4482970 (N.D. Ala. Aug. 20, 2013); *Dillard v. Town of N. Johns*, 717 F. Supp. 1471 (M.D. Ala. 1989); Consent Order, *Taylor v. Jefferson Cty. Comm'n*, No. 84C-1730 (N.D. Ala. Aug. 17, 1985); *Harris v. Graddick*, 601 F. Supp. 70 (M.D. Ala. 1984).

49.     For example, in 1963, a class of Black students and parents filed *Stout v. Jefferson County Board of Education* seeking to desegregate the Jefferson County public schools. Today, over fifty years after *Stout*'s filing, the Board remains subject to this Court's desegregation orders. The ongoing efforts of the *Stout* plaintiff class, including the named Plaintiffs in this action, to desegregate the schools operated by the Board and the municipal school systems could fill a small volume. *See, e.g.*, *Stout v. Jefferson Cty. Bd. of Educ.*, 882 F. 3d 988 (11th Cir. 2018); 537 F.2d

800 (5th Cir. 1976); 489 F. 2d 97 (5th Cir. 1974); 466 F.2d 1213 (5th Cir. 1972); 448 F.2d 403 (5th Cir. 1971); *Brown v. Bd. of Educ. of Bessemer*, 808 F.2d 1445 (11th Cir. 1987); *Baylor v. Jefferson Cty. Bd. of Educ.*, 733 F.2d 1527 (11th Cir. 1984); *Singleton v. Jackson Mun. Sep. Sch. Dist.*, 419 F.2d 1211 (5th Cir. 1969) (en banc); *United States v. Jefferson Cty. Bd. of Educ.*, 417 F.2d 834 (5th Cir. 1969); *United States v. Bd. of Educ. of Bessemer,* 396 F.2d 44 (5th Cir. 1968).

50.    Because of their history of discrimination in voting, Jefferson County and Alabama were subject to preclearance under the Voting Rights Act from 1965 to 2013. Since 1982, the U.S. Department of Justice has objected to 48 potentially discriminatory voting changes in Alabama, including several in Jefferson County. *See* U.S. Dep't of Justice, Civil Rights Div., *Voting Determination Letters for Ala.*, http://www.justice.gov/crt/voting-determination-letters-alabama.

51.    In 1986, a United States district court found that, since Reconstruction, Alabama had a pattern and practice of adopting at-large election systems to diminish Black voting strength:

> [T]he Alabama legislature, which was responsible for the at-large systems in the [defendant] counties, has consistently enacted at-large systems for local governments during periods when there was a substantial threat of black participation in the political process. This evidence, set against the background of the state's unrelenting and undisputed history of race discrimination, convinces the court that the enactment of the at-large systems during such periods was not adventitious but rather racially inspired. The evidence therefore reflects that the legislature has engaged in a pattern and practice of using at-large systems as an instrument for race discrimination.

*Dillard v. Crenshaw County*, 640 F. Supp. 1347, 1361 (M.D. Ala.), 649 F. Supp. 289, 294 (M.D. Ala. 1986), *aff'd in relevant part* 831 F.2d 246, 250 (11th Cir. 1987).

52.    Based on these findings, the district court expanded the *Dillard* case to include a defendant class of 192 counties, school boards, and municipalities, of whom 180 ultimately would have their methods of election changed by court order. *See* Jerome Gray & James U. Blacksher, *The Dillard Cases and Grassroots Black Political Power*, 46 Cumb. L. Rev. 309, 320 (2016).

53.     Because of *Dillard*, eight Jefferson County cities changed their methods of election.

54.     The Board was a defendant in *Dillard*. *Id*. Because the Board denied liability, however, no remedy to its at-large multimember district was ever adopted. In 2010, the court dismissed the pending Section 2 claim against the Board, without prejudice. Corrected Judgment, *Dillard v. Crenshaw County*, No. 2:85-cv-1332 (M.D. Ala. Dec. 16, 2010), ECF No. 740.

55.     As detailed above at ¶¶ 39-45, voting in Jefferson County is racially polarized.

56.     In addition to at-large elections, Defendants employ majority vote requirements, unusually large multimember districts, staggered terms, residency requirements, numbered places, and voter photo ID laws in Board elections that enhance the opportunity for discrimination.

57.     Because Black people are nearly two times more likely than whites in Jefferson County to lack a high school diploma, *supra* ¶ 14, the high school diploma requirement for county school board candidates, Alabama Code § 16-8-1(c)(2), disproportionately denies Black people the opportunity to even be candidates. Likewise, the "good moral character" requirement for Board candidates, *id*. § 16-8-1(c)(1), is "so vague and subjective that it . . . constitute[s] an open invitation to abuse at the hands of voting officials." *South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966). These qualifications were enacted for a discriminatory purpose and have a disparate impact.

58.     Per ¶¶ 14-16 above, Black voters continue to bear the effects of discrimination in all areas of life, which hinders their ability to participate effectively in the political process. Defendants' method of election interacts with these sociohistorical conditions to undermine Black voters' ability to participate equally in the political process and elect candidates of their choice.

59.     Board members and campaigns in Jefferson County have employed racial appeals. *See, e.g.*, *Stout*, 882 F.3d at 997.

60.     While the Black VAP of Jefferson County is 40%, at present, only one Board

11

member is Black. She was appointed in 2019 to represent Place 5 in the majority-Black subdistrict.

## A. The At-Large Multimember District is Intentionally Racially Discriminatory

61.     In violation of Section 2 and the Fourteenth Amendment to the U.S. Constitution, the Board's at-large multimember district was adopted or maintained by the State Legislature for the purpose of diluting the Black vote.

62.     As described in ¶¶ 51-52, the court in *Dillard* found that Alabama had "engaged in a pattern and practice of using at-large systems as an instrument for race discrimination." 640 F. Supp. at 1361. Alabama "has consistently enacted at-large systems for local governments during periods when there was a substantial threat of black participation in the political process." *Id*. "[B]ecause at-large elections have the effect of diluting the black vote, they are particularly favored when black persons' right to vote is relatively unfettered and black voters stand a chance of electing a candidate of their choice; when black persons' access to the ballot box is circumscribed, on the other hand, single-member districts gain in popularity." *Id.* at 1358. From 1901 to the 1980s, Alabama adopted different at-large election plans as needed to diminish Black voting strength. *Id*.

63.     The enactment of Act No. 645 reflects this pattern and practice. In 1975, the State Legislature enacted Act No. 645, creating the hybrid plan, including the at-large multimember district. The Legislature acted at a time: shortly after the first Black candidates had run for the Board and after the first Black people had won at-large Birmingham City Council seats; when Black voter registration was increasing significantly across Jefferson County after the passage of the Voting Rights Act of 1965; after a federal court had invalidated discriminatory at-large multimember state legislative districts in Jefferson County, *see, e.g.*, *Sims v. Amos*, 336 F. Supp. 924, 931-36 (M.D. Ala. 1972) (three-judge court), *aff'd* 409 U.S. 942 (1972) (mem.); and when the Board and the State were strongly opposed to school desegregation and the rights of Black

12

people. *See, e.g.*, *Knight v. Alabama*, 458 F. Supp. 2d 1273 (N.D. Ala. 2004); *Whitfield v. Oliver*, 399 F. Supp. 348 (M.D. Ala. 1975) (three-judge court); *Alabama v. United States*, 314 F. Supp. 1319 (S.D. Ala. 1970) (three-judge court); U.S. Dep't of Justice, Civil Rights Div., *Voting Determination Letters for Ala.*, *supra* (objecting under Section 5 of the Voting Rights Act to four racially discriminatory voting laws passed by the Alabama Legislature in 1975).

64.     Act No. 645 was a local act that only affected Jefferson County. In 1975, the Alabama Legislature would perfunctorily pass any local act that was unanimously endorsed by the Local Delegation (i.e., the State House and Senate members elected from the affected county). While nearly all white House member of the Jefferson County Delegation sponsored Act No. 645, four of the Black House members of the Delegation declined to support or vote for Act No. 645. Contrary to normal procedures, however, the Black House members' opposition to Act No. 645 did not defeat it. Rather, the Legislature passed Act No. 645 despite Black legislators' opposition.

65.     Act No. 645's lead sponsor supported and was a delegate for George Wallace's 1976 presidential campaign, wherein Wallace explicitly ran on antipathy to school desegregation. Co-sponsors of Act. No. 645 also sponsored Act No. 3 (1973) and Act No. 507 (1969), which federal judges or the U.S. Justice Department later enjoined based on findings that these laws discriminated against Black voters in Jefferson County. *See, e.g.*, *Sims v. Amos*, 365 F. Supp. 215, 223 (M.D. Ala. 1973) (three-judge court), *aff'd sub. nom. Wallace v. Sims*, 415 U.S. 902 (1974) (mem.); U.S. Dep't of Justice, Civil Rights Div., *Voting Determination Letters for Ala.*, *supra*.

66.     Under the 1970 Census, the total population of Jefferson County was 644,991 (68% white and 32% Black). Per the 1970 Census, the multimember district contained a 77% white and 23% Black population and the subdistrict had a 62% white and 37% Black population. In 1975, the sponsors of Act No. 645 had access to this 1970 Census data. Accordingly, the immediate and

13

foreseeable impact of Act No. 645 in 1975 was to drastically reduce the Black percentage of the population that could vote for Board Places 1 to 4 from 32% to 23%; and to limit Black voter influence on the Board. The discriminatory purpose and effect of the multimember district was to dilute the influence of Black voters in elections to the Board for the numbered places 1 through 4.

67.    Despite additional municipal secessions after 1975, the disproportionate racial impact of Act No. 645 persists today.

68.    Together, these facts and the totality of the circumstances described above at ¶¶ 46-60 show the intentionally discriminatory intent underlying the at-large multimember district.

## CLAIMS FOR RELIEF

69.    Plaintiffs hereby re-allege and incorporate by reference ¶¶ 13-68 above.

**I.     Count 1: The At-Large Multi-Member District Violates Section 2 of the Voting Rights Act (52 U.S.C. § 10301) (All Plaintiffs Against All Defendants)**

70.    Under the totality of circumstances, the at-large multimember district, along with racially polarized voting, numbered posts, the educational and morality candidate requirements and other factors, have the result or purpose of denying or abridging the rights of Plaintiffs in that Black voters have less opportunity than whites in Jefferson County to participate in the political process and elect representatives of their choice in violation of Section 2. 52 U.S.C. § 10301.

**II.    Count 2: The At-Large Multi-Member District is Intentionally Discriminatory in Violation of the U.S. Constitution (42 U.S.C. § 1983) (All Plaintiffs Against All Defendants)**

71.    Defendants' at-large multimember district was intentionally adopted or is being maintained to dilute the votes of Black voters, including Plaintiffs, in violation of the Fourteenth Amendment to the United States Constitution. 42 U.S.C. § 1983; U.S. Const. amend. XXIV.

## PRAYER FOR RELIEF

72.    Unless enjoined by this Court, Defendants will continue to violate Section 2 and

14

the U.S. Constitution by conducting elections under the illegal at-large multimember district.

    73.    WHEREFORE, Plaintiffs respectfully ask the Court to enter an order:

    a.    Issuing a declaratory judgment that:

    i.    Defendants' at-large multimember district with the numbered posts has a racially discriminatory result and purpose in violation Section 2; and

    ii.    Defendants' multimember district is unconstitutional insofar as Act No. 645 was enacted or is maintained for a racially discriminatory purpose;

    b.    Enjoining Defendants, their agents and successors in office, and all persons acting in concert with, or as an agent of, any Defendants, from administering, implementing, or conducting any and all future elections under the at-large multimember district;

    c.    Ordering Defendants to divide the multimember district into four properly apportioned single-member districts or another system that complies with Section 2 and the voting rights principles of the U.S. Constitution;

    d.    Retaining jurisdiction over this action pursuant to Section 3(c) of the Voting Rights Act and requiring Defendants to obtain preclearance through a determination from this Court that any proposed changes impacting any aspect of the elections for the Board do not have the purpose or effect of denying or abridging the right to vote based on race, 52 U.S.C. § 10302(c);

    e.    Ordering Defendants to pay Plaintiffs' costs, expenses, and other reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e); and

f.      Ordering any such additional relief as the interests of justice may require.

Respectfully submitted on November 7, 2019,

/s/ Deuel Ross                               /s/ Sidney M. Jackson

<table>
<tr><td>Sherrilyn Ifill<br><em>President and Director-Counsel</em><br>Leah C. Aden*<br>Deuel Ross*<br>Monique Lin-Luse*<br>NAACP LEGAL DEFENSE AND<br>   EDUCATIONAL FUND, INC.<br>40 Rector Street, 5th Floor<br>New York, NY 10006<br>Phone: (212) 965-2200<br>Fax: (212) 226-7592<br>laden@naacpldf.org<br>dross@naacpldf.org<br>mlinluse@naacpldf.org</td><td>Sidney M. Jackson<br>Alabama Bar No. ASB-1462-K40W<br>WIGGINS CHILDS PANTAZIS<br>   FISHER & GOLDFARB, LLC<br>301 19th Street North<br>Birmingham, AL 35203<br>Phone: (205) 341-0498<br>Fax: (205) 254-1500<br>sjackson@wigginschilds.com</td></tr>
</table>

*Pro Hac Vice Motions forthcoming*

17