IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

TRACI JONES, et al.,

        *Plaintiffs*,

v.

JEFFERSON COUNTY
BOARD OF EDUCATION, et al.,

        *Defendants*.

Case No.: 2:19-cv-01821-MHH

# ORDER

Before the Court is the joint motion of the plaintiffs -- Traci Jones, Robert Sellers, and Greater Birmingham Ministries -- and the defendants -- the Jefferson County Board of Education and Alan King, in his official capacity as the Probate Judge of Jefferson County -- to resolve this litigation. (Doc. 9).

The plaintiffs initiated this action to enforce Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, and the Fourteenth Amendment to the United States Constitution. In their complaint (Doc. 1), the plaintiffs allege that the at-large multimember district used to elect Board members has the purpose and effect of denying or abridging the rights of Black citizens to an equal opportunity to participate in the political process and to elect representatives of their choice to the Board in violation of both Section 2 and the United States Constitution.

The plaintiffs and the defendants, through counsel, have discussed the

allegations in the complaint and agree that this action should be settled without protracted, costly, and divisive litigation. The parties share the goal that all future Board elections shall comply with Section 2 and the U.S. Constitution. As a result, the parties have jointly proposed an order resolving their dispute.

After examining the complaint and the materials relating to the parties' proposed order, the Court is satisfied that the parties' proposed order is a fair and reasonable resolution of the plaintiffs' claims. Therefore, the Court adopts the following agreed findings of fact:

## **FACTS**

### A. **Background**

1. The Jefferson County Board of Education is an elected government body responsible for the management and administration of the Jefferson County School District.

2. Alan King is the Probate Judge of Jefferson County, Alabama and the chief election official in Jefferson County. He is responsible for the administration of the elections for the Board. The plaintiffs sued Judge King in his official capacity solely to ensure a complete remedy.

3. According to the 2010 Census, the total population of Jefferson County is 658,466 people. Of this total population, 340,213 (51.67%) are non-Hispanic white, 280,083 (42.54%) are non-Hispanic, any part Black people, and 25,488

(3.87%) are Hispanic people of any race. The voting age population of Jefferson County is 54.53% White, 40.16% Black; and 3.39% Hispanic.

4. In 1975, Alabama Act No. 645 established the current method of electing the members of the Board. Under Act. No. 645, the Board is elected from two electoral districts: four members are elected at-large from a "multimember" district and the fifth member is elected from a single-member "subdistrict." Before 1975, all five members were elected at-large by every voter in the County. Act No. 645 (1975), as subsequently amended, is now codified at Alabama Code § 45-37-100.

5. Each Board member is elected from numbered places for staggered six-year terms. All Board members possess the same authority and voting powers. The multimember district encompasses the areas of Jefferson County where the Board operates the public schools. Only voters residing in the multimember district can vote at-large for the Board members in Places 1 to 4. The subdistrict includes only those areas of Jefferson County where independent municipalities operate the public schools. The subdistrict elects the Board member in Place 5.

6. The next Place 4 election is scheduled for 2020; Place 1 and 5 elections are in 2022; and the next Place 2 and 3 elections are in 2024. Each Board member serves a six-year term.

7. The multimember district's voting age population is 70.5% White, 25%

Black, and 2.8% Hispanic.

8. The total population of the subdistrict is majority-Black (50.13%). The voting age population of the subdistrict is plurality-Black: 48.2% Black, 46% White, and 3.7% Hispanic.

9. The primary elections have a majority vote requirement. Ala. Code § 17-13-20.

## B. The At-Large Multimember District

10. Only White people have ever been elected from the Board's at-large multimember district. The four current Board members elected from the multimember district are all White.

11. From 1986 to 2018, Jacqueline Anderson Smith, a Black woman and the candidate preferred by Black voters, was repeatedly elected to the Board from the majority-Black subdistrict. After Ms. Smith resigned earlier this year, the Board appointed another Black woman to finish Ms. Smith's term.

12. Ms. Smith is the first and only Black person ever elected to the Board.

13. Based on the undisputed facts in the record, including the expert testimony and ecological inference analysis of Dr. Baodong Liu, voting is racially polarized in the multimember district insofar as Black voters are politically cohesive and White people vote sufficiently as a bloc to enable them to defeat Black voters' preferred candidates. For example:

4

  a. In the 2018 at-large Place 2 election, Martha Bouyer, the Black candidate, lost the election with 95.56% of the Black vote and only 17.21% of the non-Black vote;

  b. For the biracial election for the Jefferson County District Attorney in 2010, the Black candidate received 96.5% of Black voter support, but only 15.7% of non-Black voter support.  For the 2008 biracial statewide U.S. Senate election, the Black candidate received 97% of Black voter support in Jefferson County, but only 18% of non-Black voter support in the County. Both Black candidates lost to their White opponents.

  c. In two additional 2018 biracial countrywide elections for District Attorney and Sheriff, the Black candidates won narrow countywide elections despite sharply polarized voting by race.  However, if those same elections had been held only within the 103 precincts of the Board's multimember district, both Black candidates would have lost to their White opponents.  In those 103 precincts, the Black District Attorney and Sherriff candidates got 99.2% and 97.4% of the Black vote, respectively, and only 23.95% and 18.0%, respectively, of support from non-Black voters.

 14. Based on the expert testimony of Mr. William Cooper, regardless of whether the relevant jurisdiction is all of Jefferson County or the multimember

5

district, Black people are sufficiently populous and geographically compact enough to be a majority of the citizen voting age population in at least two out of five single-member districts.

15. Based on the undisputed facts in the record, including the expert testimony of Dr. Liu and Mr. Cooper, and the totality of circumstances, as illuminated by the "Senate factors,"[1] the at-large multimember district with numbered posts results in Black voters being denied an equal opportunity to participate in the political process and elect representatives of their choice.

16. In addition to the evidence of racially polarized voting (factor two), *supra* ¶ 14, and the fact that no Black person has ever won in the multimember district (factor seven), *supra* ¶¶ 11-13, there is evidence relevant to the first, third, fifth, and sixth factors. For example:

    a. Black citizens in Jefferson County have suffered racial discrimination in voting, education, employment, and jury selection. *See, e.g.*, *Ala. State Conf. of the NAACP v. Pleasant Grove*, No. 2:18-cv-02056, 2019 WL 5172371 (N.D. Ala. Oct. 11, 2019); *Stout v. Jefferson Cty. Bd. of Educ.*, 882 F.3d 988 (11th Cir. 2018); *Ala. Legis. Black Caucus v.*

---

[1] The Senate factors are: (1) a history of voting-related discrimination; (2) racially polarized voting in the relevant jurisdiction; (3) practices that enhance the opportunity for discrimination; (4) the exclusion of minorities from candidate slating processes; (5) the effects of any past racial discrimination in education, employment, health, etc. on minorities' ability to participate in the political process; (6) the use of racial appeals in political campaigns; and (7) the extent to which minorities have been elected to office. *See Thornburg v. Gingles*, 478 U.S. 30, 44-45 (1986).

*Alabama*, 231 F. Supp. 3d 1026 (M.D. Ala. 2017) (3-judge court); *United States v. Jefferson County*, No. 74-S-17, 2013 WL 4482970 (N.D. Ala. Aug. 20, 2013); *Cochran v. Herring*, 43 F.3d 1404 (11th Cir. 1995); *Dillard v. N. Johns*, 717 F. Supp. 1471 (M.D. Ala. 1989); *Harris v. Graddick*, 601 F. Supp. 70 (M.D. Ala. 1984).

    b.    The Board remains subject to a school desegregation order, the at-large multimember district employs a numbered post/place requirement, and recent political campaigns related to the schools have used racial appeals. *See, e.g., Stout*, 882 F.3d at 997-98 (describing a flyer distributed by Gardendale secessionists that derided racially diverse communities but called largely White cities "some of the best places to live").

17.    There is a basis in both fact and law for finding that Act No. 645 (1975) was enacted at least in part for the purpose of limiting the influence of Black voters in Board elections. Pursuant to *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977), some of the most relevant facts supporting this finding include that:

    a.    In 1975, Act No. 645 reduced the Black population percentage that could vote for Places 1 to 4 from 32% to 23%, and this racial impact persists, *supra* at ¶¶ 3-8;

    b.    In 1975, the Alabama Legislature's practice was (and is) to pass

7

a local act only if it is unanimously endorsed by the Local Delegation (i.e., the State House and Senate members elected from the affected county). Act No. 645 was a local act that affected only Jefferson County. Nearly every White legislator in the Local Delegation sponsored Act No. 645. Three Black House members opposed Act No. 645. The Black House members' opposition should have defeated Act No. 645, but it did not. Instead, the Legislature departed from its usual procedural practices to change the Board's method of election over the objections of the Black legislators; and

    c.    In 1975, Act No. 645's sponsors and much of the Legislature were openly opposed to school desegregation and had used at-large multimember districts and other devices to discriminate against Black people in Jefferson County and elsewhere in the State of Alabama. *See, e.g.*, *Knight v. Alabama*, 458 F. Supp. 2d 1273 (N.D. Ala. 2004); *Sims v. Amos*, 336 F. Supp. 924 (M.D. Ala. 1972) (3-judge court), *aff'd* 409 U.S. 942 (1972) (per curium); *Whitfield v. Oliver*, 399 F. Supp. 348 (M.D. Ala. 1975) (3-judge court); *Alabama v. United States*, 314 F. Supp. 1319 (S.D. Ala. 1970) (3-judge court).

## **DECLARATORY AND REMEDIAL ORDERS**

Based on these factual findings, the Court finds, declares, and orders as

follows:

18. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a), 1357, and 2202 and 52 U.S.C. §§ 10301 and 10302. To date, the defendants have been charged with implementing or enforcing the actions enjoined by this order, and each party has the power to enter into this order. *See Dillard v. Crenshaw County*, 748 F. Supp. 819, 828 (M.D. Ala. 1990) (citing *Tallahassee Branch of NAACP v. Leon County.*, 827 F.2d 1436, 1440 (11th Cir.1987)).

19. The at-large multimember district for the Board violates Section 2, 52 U.S.C. § 10301, and the Fourteenth Amendment. 42 U.S.C. § 1983.

20. The "Remedial Map," appended as Attachment 1, remedies the Section 2 and constitutional violations identified in the complaint and substantiated by the factual findings above. *See Dillard v. Crenshaw County*, 831 F.2d 246, 252 (11th Cir. 1987). Under the Remedial Map, the multimember district is divided into four single-member districts. District 1 has a majority-Black citizen voting age population. The Remedial Map does not change the subdistrict (District 5).

21. Given the passage of the November 8, 2019 filing deadline for candidates for the Jefferson County School Board, the Remedial Map shall not be used in the 2020 elections.

22. For all Board elections held after 2020, the defendants, their successors, employees, agents, and all others acting in concert with them or at their direction

shall not use the at-large multimember district.  Instead:

    a. the Remedial Map shall be used for the 2022 elections for the Board and for every election afterwards until modified by the Court;

    b. the defendants shall hold elections:  in 2022 in District 5 and, using the Remedial Map, in District 3; in 2024, using the Remedial Map, in Districts 1 and 2; and in 2026, using the Remedial Map, in District 4.  Incumbent board members for Districts 3 and 5 shall hold their seats on the Board until 2022.  Incumbent board members for Districts 1 and 2 shall hold their seats on the Board until 2024, and the incumbent board member for District 4 shall hold that seat on the Board until 2026.

    c. Board members elected under the Remedial Map shall have the same rights, privileges, duties, immunities, and other responsibilities as those members who previously have been elected at-large from the multimember district, including, but not limited to, the same voting rights and the same access to the same resources.

23.    Within 30 days of the entry of this order, the parties shall confer and inform the Court of their plan to notify affected voters and the public about the Remedial Map through mailings, newspapers, television, radio, the Internet, or other appropriate media.  The Board shall bear the expense of any publication and notice required pursuant to this paragraph.

24. Each party shall bear its own costs and attorney's fees incurred to-date in this case.

25. The Board shall ask its Local Delegation to enact a law providing for the method of electing the Board set forth in this order. If the Alabama Legislature enacts such a law, the defendants may petition the Court to dissolve the relevant portions of this order.

26. Following the release of each new decennial U.S. Census data, the Board shall review that data to determine whether the Remedial Map, as approved by the Court, needs to be revised to comply with Section 2 and other relevant state and federal law. If, after the release of such data, the Board determines that a revised map is needed because of population shifts, the Board shall notify the plaintiffs 30 days before adopting a revised map. If a revised map is needed, the parties shall work together to revise the Remedial Map as little as possible and to submit any revisions to the Court for review pursuant to 52 U.S.C. § 10302(c).

27. Given the constitutional violations identified in this order, *see supra* ¶¶ 16(a) and 17, from the date of the entry of this order through December 31, 2031, no changes to voting standards, practices, or procedures with respect to (a) the method of electing the Board, including the Remedial Map, or (b) which citizens are eligible to participate in voting for the Board because of municipal

secessions[2] or other changes shall be enforced or administered unless or until the defendants obtain the permission of the Court pursuant to 52 U.S.C. § 10302(c).

28. To enforce this order and to order further relief as necessary, the Court retains jurisdiction over this matter.

**DONE** and **ORDERED** this 16th day of December, 2019.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

[2] *Robinson v. Alabama State Dep't. of Educ.*, 652 F. Supp. 484, 486 (M.D. Ala. 1987) (3-judge court).

**ATTACHMENT 1**



## Population Summary Report
### Jefferson County BOE

| District | Population | Deviation | % Deviation | AP Black | % AP Black | Latino | % Latino | NH White | % NH White |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 56789 | -881 | -1.53% | 27916 | 49.16% | 1808 | 3.18% | 26518 | 46.70% |
| 2 | 57696 | 26 | 0.05% | 6466 | 11.21% | 647 | 1.12% | 49847 | 86.40% |
| 3 | 57681 | 11 | 0.02% | 25047 | 43.42% | 3594 | 6.23% | 28322 | 49.10% |
| 4 | 58513 | 843 | 1.46% | 6217 | 10.62% | 1774 | 3.03% | 49331 | 84.31% |
| 5 | 427787 | NA | NA | 214437 | 50.13% | 17665 | 4.13% | 186195 | 43.53% |
| Total | 658466 | | | 280083 | 42.54% | 25488 | 3.87% | 340213 | 51.67% |

**4-District Total Deviation**   2.99%

| District | 18+_Pop | 18+ AP Black | % 18+ AP Black | 18+ Latino | % 18+ Latino | 18+ NH White | % 18+ NH White | NH BCVAP | LCVAP | NH WCVAP |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 43486 | 19924 | 45.82% | 1091 | 2.51% | 22047 | 50.70% | 50.15% | 0.47% | 46.96% |
| 2 | 45024 | 4810 | 10.68% | 431 | 0.96% | 39247 | 87.17% | 12.55% | 0.53% | 84.24% |
| 3 | 42308 | 15843 | 37.45% | 2257 | 5.33% | 23631 | 55.85% | 43.98% | 1.43% | 52.60% |
| 4 | 45712 | 4108 | 8.99% | 1110 | 2.43% | 39556 | 86.53% | 10.99% | 0.89% | 85.71% |
| 5 | 327408 | 157696 | 48.16% | 12201 | 3.73% | 150307 | 45.91% | 49.48% | 1.34% | 47.22% |
| Total | 503938 | 202381 | 40.16% | 17090 | 3.39% | 274788 | 54.53% | | | |

Note:
% Citizen VAP calculated by disaggregating 2013-2017 ACS block group estimates to 2010 census blocks.